# EXHIBIT 1

**GRAND COURT OF THE CAYMAN ISLANDS**

**FINANCIAL SERVICES DIVISION**                **FSD CAUSE NO:**

**IN THE MATTER OF THE COMPANIES ACT (2022 REVISION)**

**AND IN THE MATTER OF UPHOLD LTD**

_____

**WINDING UP PETITION**
_____

**TO THE GRAND COURT OF THE CAYMAN ISLANDS THE HUMBLE PETITION OF:**

i.   William Laggner of 5906 London Ct, Dallas TX 75252 USA

ii.  Bearing Ventures LLC of 251 Little Falls Drive, Wilmington, New Castle, DE, 19808

iii. West End Capital II LLC of 2211 Broadway Suite 11C, New York, NY, 10024 USA

iv.  Charles Simmons of 2627 Stuart Manor, Houston, TX, 77082 USA

v.   Peter Kearns of 270 Wendover Drive, Princeton, NJ 08540 USA

vi.  Michael Zaitsev of 241 W 97th St, Apt 14M, New York NY 10025 USA

(i. – vi. together the "**Petitioners**") shows that:

**The Company**

1.   Uphold Ltd (the "**Company**") was incorporated as BitReserve Ltd under the Companies Act of the Cayman Islands as an exempted limited company on 20 December 2013 under

1

This **WINDING UP PETITION** was filed by Travers Thorp Alberga, attorneys for the Petitioner, whose address for service is FSD2022-0134, 2nd Floor Harbour Place, 103 S. Church Street, Grand Cayman, KY1-1106, Cayman Islands. (Ref: L0705-001) 2022-06-14

    company number 283772. The Company's name was changed to Uphold Ltd on or around 23 February 2015.

2.    The registered office of the Company is situated at Maples Corporate Services Limited, PO Box 309, Ugland House, Grand Cayman, KYI-1104, Cayman Islands.

3.    As at the date of this Petition, the Company is in good standing with the Cayman Islands Corporate Registry. The Petitioners believe the Company is solvent in the sense that its assets exceed its liabilities.

4.    The Company operates in the cryptocurrency and blockchain industry. It provides a wallet blockchain platform that facilitates payments within and to the financial services industry. The Company primarily operates in the United States of America, although its online services are available globally and facilitate payments in multiple currencies.

**The Petitioners**

5.    The Petitioners are all shareholders in the Company. To the best of their information and belief the Petitioners were registered as the holders of the following number and classes of share in the Company set out in the table below.

| Name | Date | Type of Share | Number of Share |
|---|---|---|---|
|  |  |  |  |
| Bearing Ventures LLC | 9 May 2014 | A | 379,507 |
|  | September 2014 | B | 22,516 |
|  | 27 May 2016 | B1 | 14,418 |
| Chuck Simmons | September 2014 | B | 27,777 |
| West End Capital II LLC | 15 January 2016 | B1 | 50,000 |
| Peter Kearns | 25 February 2016 | B1 | 84,965 |
|  | 3 September 2016 | B2 | 12,150 |
|  | 31 January 2017 | B3 | 4,475 |
| Michael Zaitsev | 25 February 2016 | B1 | 12,136 |

2

This **WINDING UP PETITION** was filed by Travers Thorp Alberga, attorneys for the Petitioner, whose address for service is FSD2022-0134, 21st Floor Harbour Place, 103 S. Church Street, Grand Cayman, KY1-1106, Cayman Islands. (Ref: L0705-2006-14)

| William Laggner | May 2019 | Ordinary | 4,843,890 |

6. Mr Laggner entered into an agreement for sale dated 26 June 2016 with Halsey Minor, the Company's founder. Under the agreement, Mr Laggner became entitled to 4,843,890 of Mr Minor's ordinary shares in or around late June 2016. Mr Minor initially refused to comply with his obligation to transfer the shares and only did so on or around May 2019 following the commencement of proceedings against him. In these circumstances Mr Laggner held at least a beneficial interest in these shares from no later than late June 2016 and is accordingly entitled to seek relief in respect of any prejudice suffered by him in his capacity as shareholder arising out of acts or omissions that took place on or after that date.

**Proposed Respondents**

7. The Petitioners intend to serve this Petition on the Company and the following shareholders who they will seek to join for the purpose of obtaining alternative relief from: Adrian Steckel, Uphold Holdings LLC, ASP Capital Sub I Inc and Amherst Holdings Limited (the "Proposed Respondents"). All of the Proposed Respondents have either participated in or benefitted from the conduct complained of in this Petition and set out in more detail below.

**Background and initial finance rounds**

8. The Company was founded in 2013 by Halsey Minor. It was known as Britreserve at the time. Mr Minor was one of the initial directors along with, JP Theriot, and Tim Parsa. The Company initially raised approximately US $2 million from those four individuals.

9. Shortly after it was founded in 2013, Mr Laggner was introduced to the Company by Mr Thieriot. In around February 2014, a group of investors including Mr Laggner agreed to invest in the Bitreserve Series A financing, which targeted a $5,000,000 raise. They did so through Bearing Ventures LLC, who acquired 580,000 A shares in the Company.

10. The Series A round met its target of a $5,000,000 raise. The Company subsequently began beta testing of their "internet of money" wallet/blockchain platform. During the first

3

half of 2014, Mr Laggner made numerous introductions to Messrs Thieriot and Parsa of other successful entrepreneurs. Mr Laggner decided at the time to forego any compensation while focusing instead on involving investors and strategic partners that could add credibility to the Bitreserve platform.

11. Mr Laggner was appointed to the board at the 1 August 2014 board of directors meeting. This took place by way of conference call involving board members Halsey Minor (Chairman), Tim Parsa (President), JP Thieriot (Vice Chairman) and Laura Childress. Daniel Friedberg, attorney for the company, attended the meeting by phone at the invitation of the board.

12. The board minutes of that meeting confirmed Mr Laggner's appointment and noted that "*such appointment shall not constitute an employment contract and such appointment remains in the discretion of the shareholders*".  The reference to shareholders' discretion was a reflection of his having introduced a significant cohort of credible investors, amongst other things.

**The Investor Rights Agreement**

13. Mr Laggner's investors required protection from subsequent dilutive share issues.  They did not constitute a majority of shareholders.  The Investment Rights Agreement ("IRA") which was entered into initially in 2014 and was revised in 2015 following the B share round and to which the Company, Bearing Ventures LLC and Charles Simmons amongst others were party provided the anti-dilution protection they required.  Paragraph 2.5 of the IRA provided as follows:

> "…Each time the Company proposes to offer any shares of**, or securities convertible into or exchangeable or exercisable for any of its share capital** (Shares) the Company shall first make an offering of such Shares to each investor in accordance with the following provisions:
> (a)     The Company shall deliver a notice in accordance with section 3.5 (Notices) to each Investor stating (i) its bona fide intention to offer such Shares, (ii) the number of such Shares to be offered and (iii) the price and terms on which it proposes to offer such Shares;
> (b)     Each investor may elect to purchase, at the price and on the terms specified in the Notice, [their pro rata portion]" (emphasis added)

4

14. A further important restriction on new share issues was contained in the Articles of Association dated 28 April 2015. Article 3.2 prevented the Company from issuing or obligating the company to issue:

> "*any shares or including any other right or security convertible into or exercisable for any such shares having a preference over or being pari passu with any series of Preferred Shares with respect to dividends, liquidation or redemption [without the approval of the majority of the Series A Preferred Shares].*"

**The B Round**

15. Further finance was required after the A round. Mr Laggner played a central role in the follow up raise, which led to the issue of further B preference shares at the end of 2014 and raised $12m. The Company complied with its obligation under the IRA to offer Mr Laggner's investors and other holders of the A preference shares the right to acquire their proportionate share of the new B shares and thereby avoid dilution. Mr Laggner's investors took up the offer and additional B shares were acquired as a result.

16. As part of the B round, the holders of B preference shares, led by Ricardo Salinas Pliego (operating through Kylie Company), appointed Mr Steckel as their board representative on 20 May 2015. The B shareholders could have exercised their right under the IRA as amended and the Articles to remove Mr Laggner from the board but did not do so. There was in fact never any suggestion at board or shareholder level that Mr Laggner should not continue to serve on the board and continue to devote time and resources to the Company's business.

**Mr Steckel and the Salinas connection**

17. Mr Steckel is a close associate and former employee for over 20 years of Ricardo Salinas Pliego. When Mr. Steckel joined the Company, Mr. Steckel continued his employment with Mr. Salinas. According to an investigation published on 8 April 2021 by the Wall Street Journal, Mr Salinas has a history of using questionable tactics to acquire and then extract profit from businesses he invested in. He has also been subject to regulatory action by the Securities and Exchange Commission of the United States in respect of the company Sarbanes Oxley.

5

This **WINDING UP PETITION** was filed by Travers Thorp Alberga, attorneys for the Petitioner, whose address for service is FSD2022-0134 21st Floor Harbour Place, 103 S. Church Street, Grand Cayman, KY1-1106, Cayman Islands. (Ref: L0702.0006) 2022-06-14
Page 5 of 18

**Mr Steckel engineers a split in the board**

18. By the first quarter of 2016, the Company was in a distressed state. A split in the board was emerging. On one side, Mr Minor and Mr Laggner wished the Company to pursue a conservative strategy and in particular to conserve cash flow. At the time, monthly expenses were running at $1.2m against revenue of $20,000. Mr Laggner asked Mr Watson to defer his $85,000 monthly salary and make other cuts such as laying off consultants and cutting excess overhead to better manage cash flow in the crisis. Mr Laggner also requested that an audit of the Company be carried out in 2016 for the purpose of investigating the excessive spending and potential misallocation of corporate funds that he felt was being incurred at the executive level. Mr Laggner's concerns were ignored and the audit request was denied by a majority of the board

19. On the other hand, Mr Steckel, Mr Thieriot, Mr Parsa and Mr Watson (the "Steckel Faction") appeared determined to run the Company down by maintaining an unsustainable expenses to revenue ratio whilst failing to progress reasonable opportunities to obtain further finance on reasonable terms. For example, there was an offer pending on up to $10m financing at the time from South African firm and a decision on $50m was promised from a Saudi Arabian businessman. Neither was followed through. In addition, one of Mr Laggner's friends, and founder of the largest fibre optic company in Canada, talked with Mr Watson in early 2016. He said he would invest $2,000,000 for every $1,000,000 invested by Mr Watson, yet Mr Watson ignored him and never even returned his call. On another occasion in the spring of 2016, Mr Laggner set up a meeting for Mr Watson with a family office in Los Angeles (which is a family office with assets under management of over $10billion), yet Mr Watson failed to show up and never followed up with the investment group. It is clear that the reason for not pursuing those alternative financing options is because of the Steckel Faction wishing to ensure that the Company came under their, and therefore Mr Salinas', control.

20. Failing to follow through with any of these potential sources finance was irrational and not in the Company's best interests. Rather it was part of a plan initiated by Mr Steckel to engineer an unnecessary cash crisis so that Mr Steckel could be presented as a lender of last resort on terms which amounted to a take-over of the Company. This was in breach

6

FSD2022-0134   Page 6 of 18   2022-06-14

of the duties owed by the Steckel Faction to act in the best interests of the Company, to avoid conflicts of interest, and to act for proper purposes. Pending discovery, the Petitioners are unable to set out the precise nature of the relationship between Mr Steckel and Mr Salinas or the terms on which they conspired with other members of the board to effect a take-over of the Company. The best particulars the Petitioners can provide pending discovery are that the plan was discussed and agreed in principle at a series of meetings and discussions which were kept from Mr Laggner and Mr Minor and which culminated in a meeting or meetings which took place in Mexico during late Spring/early Summer 2016. These meetings led to the presentation of a "take it or leave it" offer of finance from Mr Steckel which carried interest at 24% per interest and the right for Mr Steckel to acquire control of at least half the Company's shares for $.01 per share (the "Steckel Transaction").

**The takeover**

21. In early June 2016, Mr Parsa (a former employee of Mr Salinas) reported to the board that a meeting or series of meetings had taken place in Mexico between him, Mr Steckel and Mr Salinas. These were with a view to Mr Salinas providing finance to the business through Mr Steckel. Mr Parsa emailed the board on 19 June 2016 with a proposed operating plan that he claimed Mr Steckel and he believed would be acceptable to Mr Salinas. Mr Parsa followed up with details of the main terms of Mr Salinas' offer in another email to the board sent on 22 June 2016, which left no room for any doubt from these terms that this was intended to be a Salinas takeover of the Company. At this stage, the intent appeared to be for 30% of the Company's shares held by Halsey Minor to be purchased by Mr Salinas. This would have required Halsey Minor's consent, which he had made clear would not be forthcoming.

22. The board met later the same day that Mr Parsa had purported to communicate Mr Salinas' terms (22 June 2016) to discuss the term sheets. At the meeting it appeared to Mr Laggner that a majority of the board had already committed the Company to agreeing Mr Salinas' terms. There was no meaningful examination of the proposed terms, the alternatives, or of what was in the best interests of the Company. Halsey Minor made it clear that he wanted no part in the takeover and resigned in protest. Mr Laggner made his objections known (the minutes incorrectly omit this), but decided to remain on the board

7

This **WINDING UP PETITION** was filed by Travers Thorp Alberga, attorneys for the Petitioner, whose address for service is FSD2022-0134, 21st Floor Harbour Place, 103 S. Church Street, Grand Cayman, KY1-1106, Cayman Islands. (Ref: L0705.0006) 2022-06-14

Case No. 1:23-mc-00074-NYW   Document 1-3   filed 08/09/23   USDC Colorado   pg 9 of 19

FSD2022-0134                           Page 8 of 18                           2022-06-14

in order to attempt to protect the interests of the shareholders he represented. The meeting then resolved to approve the Salinas terms without any qualification and Mr Steckel was appointed as Chairman in Mr Minor's place. The board meeting was a sham, for the sake of appearances only, because a majority had already agreed to commit the Company to the Steckel Transaction at the Mexico meetings and had no intention of deviating from their plan. This was in breach of their duties to act in the best interests of the Company.

23. Mr Laggner and Mr Minor were in regular contact throughout this time. They were both convinced this proposed takeover was disastrous for the Company. They agreed to try to persuade the board to change its mind and find alternative sources of funding on less egregious terms, which became known as the White Knight terms. Mr Laggner and Mr Minor had discussed bridge financing and related operational changes at the Los Angeles board meeting on 17 June 2016, after Mr Watson confirmed he had run the company out of money by pursuing large acquisition targets along with Mr Thieriot without prior board approval. Mr Laggner and Mr Minor decided to contact Bechtel (Increscent LLC) and other investor groups in order to provide bridge financing to the Company. Bechtel, Mr Minor and Mr Laggner agreed that the Laggner/Bechtel group would propose bridge financing, operational changes and a plan to get the company to break even over the subsequent months. By 23 June 2016, there was a mutually agreed upon document.

24. Mr Minor sent Mr Laggner and other board members a message on 24 June 2016 asking them to use a different email address for him because his company account had been shut down unexpectedly and confirming to them that he had declined Mr Salinas' offer to purchase 30% of the Company's shares from him. Having appreciated there was no prospect of acquiring Mr Minor's shares, the Steckel Faction decided to have the Company issue a warrant which would, upon its exercise, give Mr Steckel compete control of a majority of the Company's shares for nominal consideration at the same time as borrowing from him on egregious terms such as an annual interest rate of 24%. The same day (24 June 2016) a majority of the board approved a term sheet submitted by Mr Steckel reflecting these terms and eliminating the offer to purchase Halsey Minor's shares.

25. On 29 June 2016, Mr Laggner submitted what was termed the White Knight term sheet to the board as (what he believed was) a competitive alternative to the Salinas offer. By this point, Mr Laggner had received commitments and signed term sheets from a variety of

8

This **WINDING UP PETITION** was filed by Travers Thorp Alberga, attorneys for the Petitioner, whose address for service is FSD2022-0134, 2nd Floor Harbour Place, 103 S. Church Street, Grand Cayman, KY1-1106, Cayman Islands. (Ref: L0705-2006-14

sources for approximately $8m. This number was based on a spreadsheet Mr Watson prepared and which showed his estimation of the Company's needs. Mr Laggner even went so far as to ask one of his investors, James Chen, to wire $540,000 in good faith and so as to both support immediate cash flow needs and demonstrate the availability of funds. Mr Salinas had done no such thing. The same day (29 June 2016 – the minutes are incorrectly dated 27 June 2016) there was another board meeting at which the White Knight term sheet was rejected out of hand and following no meaningful consideration. Two reasons were given in the minutes, both of which were incorrect.

26. The first reason was that Mr Laggner's terms did not provide for sufficient capital on a timely basis. This was not the case at all. One member of his group had already advanced over half a million dollars to cover immediate cash flow. This was more than Mr Salinas had been prepared to do at this stage. A capital injection of $8m would have been more than sufficient to keep the Company afloat, especially if management could be persuaded to keep costs under better control. Further, and importantly, the terms proposed by Mr Laggner were far less dilutive and onerous on the Company as against the Salinas proposal.

27. The second reason given was that funding timing and success was somewhat uncertain in that it was dependent on Outpost Capital Management securing written subscriptions and funds from third party investors that Outpost considered committed but who were not yet under written contract. This purported reason was just as fictitious as the first. Mr Laggner's investors (who were all existing shareholders at the time) were committed and had signed term sheets. Mr Salinas had not.

28. On 30 June 2016, Mr Theriot went ahead and signed Mr Steckel's Revolving Credit Facility and Warrant (which were amended several times afterwards) constituting the Steckel Transaction. The Steckel Transaction consisted of (i) a Revolving Credit Facility gave the lender the power to advance up to US $15,000,000 to the Company at an interest of 2% per month; and (ii) a Warrant issued on the same date in favour of Uphold Holdings LLC. This warrant gave Mr Steckel a right to acquire such number of shares at $0.01 per share so as to make Uphold Holdings LLC the owner of fifty percent (50%) of the issued and outstanding ordinary shares on a fully diluted basis – and thus reduced the percentage of shares owned by all other shareholders, including the Petitioners (including the shares

9

FSD2022-0134                          Page 9 of 18                           2022-06-14

beneficially by that time held by Mr Laggner following the purchase from Mr Minor). The Company also gave a guarantee on behalf of all of its subsidiaries and affiliated entities.

29. Mr Laggner emailed the board on 6 July 2016 to express his concern that the Company should not commit to the Steckel Transaction in the face of opposition from a majority of the Company's shareholders and when a vastly superior alternative in all material respects (including the terms for interest and not having to give away half of the Company) in the form of the White Knight term sheet was available. Mr Watson responded the next day noting that the board had a fiduciary responsibility to consider the White Knight terms and supported a request for a general shareholders meeting. Around this time there was a call between Messrs Bechtel, Steckel, Thieriot and Laggner. They discussed the White Knight terms. On the call, Mr Steckel admitted the White Knight terms were far better terms for the Company but would not be acceptable to his group because they did not give him control of the Company. There was never in fact any prospect of any alternative to the Steckel Transaction being considered because the Steckel Faction had agreed to pursue the Steckel Transaction regardless of the interests of the Company.

**No legal advice obtained**

30. Following execution of the Steckel Transaction Mr Laggner continued to question the board. He was concerned this might be in contravention of Cayman Islands law given in particular the fact that a majority of the Company's shareholders opposed the Steckel Transaction. No Cayman Islands law advice appears to have been sought by the Company until 29 August 2016 (see below). However at some point in mid-July and after the Company had been legally committed to the Steckel Transaction by Mr Thieriot signing the transaction documents, the Steckel Faction came to appreciate that Company was in breach of the IRA by failing to provide the holders of preference shares with the right to subscribe for an equivalent amount of shares to be issued under the Steckel Transaction and thereby avoid dilution. On 21 July 2016 preference shareholders were sent an email containing a term sheet for the issue of B2 shares that preference shareholders could acquire and thereby avoid dilution. This purported offer did not comply with the IRA in that the B2 shares were not offered on the same terms as the shares to be issued under the Steckel Transaction. The former were offered at $.255 a share compared to $0.01 offered to Mr Steckel. Further, the IRA required the Company to offer equivalent shares before

10

and not after they were offered to Mr Steckel. Further, the Company was required to hold a general meeting in order to increase its share capital in respect of the B2 shares. No general meeting was ever called and as such the B2 shares were offered and issued in breach of the Company's Articles. The Petitioners believe the reason no meeting was called was because the Steckel Faction knew that a majority of the Company's shareholder was vehemently opposed to the Steckel Transaction and would have used the meeting as an opportunity to vote against it.

31. On 29 August 2016 the Company's external United States counsel, Dan Friedberg of Fenwick and West LLP, contacted Grant Dixon, a corporate partner in the Cayman Islands firm of Maples and Calder, to request an opinion purportedly on behalf of a "lender" as to the Company's capacity to enter into the Steckel Transaction and its legal effect. Mr Dixon provided a draft pro forma opinion on 1 September 2016 but to the best of the Petitioners' information and belief no signed opinion was ever provided. In any event the Petitioners note that legal advice as to the lawfulness of the transaction was only requested following Mr Laggner's questioning and approximately one month <u>after</u> the transaction documents had been signed. This confirms their belief that the Steckel Faction had determined to and did commit the Company to the Steckel Transaction regardless of whether it was lawful and/or in the best interests of the Company, which it was not.

**Mr Laggner removed from the board**

32. In the end the Steckel Faction had had enough of being questioned and caused Mr Laggner to be removed from the board on 17 November 2016 (unbeknownst to Mr. Laggner). The reason provided by Mr Thieriot for Mr Laggner's removal was that he was in a position of conflict given he was seeking to enforce an agreement with Halsey Minor through the courts. There was no conflict. The real reason for Mr. Laggner's removal was to eliminate a source of scrutiny and questioning of the Steckel Transaction, its consequences and subsequent implementation.

**Mr Chen changes sides**

33. At some point between July and December 2016 Mr Steckel reached an agreement with one of Mr Laggner's investors, another existing shareholder Mr James Chen, pursuant to

11

This **WINDING UP PETITION** was filed by Travers Thorp Alberga, attorneys for the Petitioner, whose address for service is PO Box 472, 2nd Floor Harbour Place, 103 S. Church Street, Grand Cayman, KY1-1106, Cayman Islands. (Ref: L0702-0005)

FSD2022-0134                        Page 11 of 18                        2022-06-14

which the benefits of the Steckel Transaction would be shared between them. In the event Mr Steckel (acting through Uphold Holdings LLC) was allowed to advance $10m and Mr Chen (through Chen International Holdings Ltd and subsequently Amherst Holdings Limited) was allowed to advance $5m and subscribe for 42 and 21 million shares in the Company respectively. They were both also allowed to deploy the interest accrued at the extortionate rate of 24% to settle the already heavily discounted price payable per share of under the Warrant of $.01. Further they were allowed to subscribe for preference shares, which carried additional rights to the ordinary shares that they were to receive under the terms of the Warrant agreed in June 2016. In approving these terms the board paid no regard to the interests of the Company or its shareholders other than Messrs Steckel and Chen and their companies. There was for example no attempt to comply with the IRA or to secure better terms from any other shareholders or new investors. Instead Mr Steckel was permitted to amend the terms of his transaction with the Company to suit his needs at the time without reference to the interests or rights of the Company and its other shareholders.

**Further mismanagement after the Steckel Transaction**

34.  The Steckel Faction and Mr Chen have since caused the Company to operate without regard to the principles of proper corporate governance and have continued to cause the Company to prefer their interests over those of the Company and its shareholders generally. For example :

   a.  The Company purported to amend its Memorandum and Articles in February 2017.The amendments made to the Articles of Association in February 2017 included the creation of 5 additional classes of shares and the authority to issue additional Series A and Series B Preferred Shares, a large proportion which were issued to Mr Steckel and Mr Chen through their companies. Notice of the general meeting was not given to all shareholders. No actual meeting took place. Instead the only individual shareholder to sign the purported resolution approving the amendment was Mr Steckel himself, acting purportedly through powers of attorney or proxies for those entities which he did not have authority to represent as a director. Further a Caroline Turner was allowed to cast votes despite the fact that she was not a shareholder in the Company.

12

b.  Mr Steckel and Mr Parsa caused the Company to license its intellectual property to a rival cryptocurrency platform called AirTM through an entity called Cloud Money Ventures LLC in which Mr Steckel and Mr Parsa were interested. Mr Steckel and Mr Parsa caused the Company (improperly) not to enforce the licensing agreement and/or to waive their breaches of contract from AirTM's nonpayment, and in doing so Mr Steckel and Mr Parsa acted in breach of their own fiduciary duties to Uphold by failing to take any steps to secure any meaningful payment to the Company from AirTM for the license of its intellectual property. Subsequently, and as a result of the concerns raised by the Petitioners, the Company purported to undertake an investigation into the AirTM transaction. The purported investigation was completely meaningless because amongst other things it proceeded on the assumption that there were no contemporaneous records and that the story put forward by Mr Steckel and his associates was true. Unsurprisingly, the purported investigation concluded there was no issue. The reason given for the lack of records was an apparent loss of data from the loss of a laptop.

c.  The Company has failed to take any steps to enforce a breach of Mr Steckel and Mr Watson's duties to the company in relation to a corporate opportunity of the Company involving the Bank of London ("TBOL") which they have benefitted from personally to the detriment of the Company. In 2016 the Company was in the process of applying for a digital bank license to be able to trade in the UK through a shareholding in TBOL. The digital bank license application process began with the hiring of KPMG in London. Subsequent to the application filing KPMG and Uphold BOD's sent Mr Laggner the Uphold Bank deck which he shared with prospective institutional investors in early 2017. Former CFO, Lee Westerfield, mentioned to Mr Laggner in early-mid 2017 that the Bank of England may not be able to issue a bank license to a crypto currency company so Mr Laggner suggested that Uphold issue shares of Uphold Bank to existing shareholders followed by a capital raise. Instead, Messrs Steckel, Salinas and Watson altered the application while carving out significant equity for themselves. It has subsequently become apparent through correspondence with Uphold's Cayman counsel that Uphold had entered into an agreement under which it was only given

13

        9% of TBOL. There are clear conflicts of interests and breaches of the directors' duties to act in the best interests of the Company from this transaction, and the Petitioners understand that the Company is itself pursuing a claim against TBOL for breach of a share purchase agreement for the 9% in any event.

d.    The Steckel Faction have benefitted from share options since the Steckel transaction. Following Mr Laggner's removal from the board in late 2016, the Articles of Incorporation were changed in early 2017 through resolutions which were passed by virtue of Mr Steckel's controlling interest in the Company, both on his own behalf and via proxies and powers of attorneys that were granted to him for the shareholder resolutions to be executed. Following those changes, the Company issued Series C shares in 2018, once again following the rejection of alternative funding arrangements put forward by, amongst others, Mr Laggner, and issued further stock options to Messrs Steckel, Chen and Kidd subsequently.

e.    In 2018, Messrs Steckel, Kidd and Thieriot (and others) developed a cryptographic protocol called "Universal Protocol" which was designed to compete with other smart contract platforms enabling various forms of value to flow thru blockchains. In launching Universal Protocol, Messrs Steckel, Kidd and Thieriot appointed the founder of Cred, Dan Schatt, to be CEO.  As CEO of Cred, Schatt had built a decentralized credit product whereby token holders could put their tokens into a smart contract and borrow up to a certain percent of their collateral.  Messrs Steckel, Thieriot and Kidd failed to disclose this to Uphold shareholders while Cred partnered with Uphold and subsequently filed bankruptcy.  In essence, Cred was rehypothecating Uphold customer funds while Steckel, Thieriot and Kidd were raising money for Cred. Uphold was subsequently sued for illegally issuing securities by a Universal Protocol investor.

**Conclusion**

35.    The Petitioners humbly seek an order pursuant to section 92(e) of the Companies Act (2022 Revision) (the "**Act**") for the winding up of, or alternative relief in respect of, the Company on the basis that it is just and equitable that the Company be wound up for the following reasons:

14

a. The board has failed to act in the best interests of the Company and its shareholders and in a manner which perpetrates ongoing misconduct in the management of the Company.

b. The directors have demonstrated a lack of probity in their actions and have committed clear breaches of their fiduciary duties by engaging in a series of actions tantamount to a conspiracy to allow one of the Company's shareholders and directors, Adrian Steckel, to gain de facto control of the Company.

c. The directors have caused the Company to act in a manner which is inconsistent with its contractual obligations to certain shareholders, the Articles and/or basic principles of corporate governance.

d. The effect of the aforementioned is that the Steckel Faction has allowed Mr Steckel, and therefore Mr Salinas, to take control of the Company to the detriment and prejudice of the Petitioners.

e. The Petitioners have therefore justifiably and irretrievably lost all faith and confidence in the directors of the Company and the board's ability to manage the Company's affairs in the best interests of the Company as a whole.

f. Consequently, the Petitioners' rights and interests have been oppressed, willfully disregarded, and undermined.

36. In all the circumstances, the Petitioners consider it to be just and equitable that the Company be wound up by the Court pursuant to section 92(e) of the Act, and that alternate relief sought be granted pursuant to section 95(3) of the Act for the purchase of the Petitioners' shares (which for the avoidance of doubt the Petitioners seek as their primary remedy).

**AND YOUR PETITIONERS THEREFORE HUMBLY PRAY THAT**

1. The Company be wound up by the Court in accordance with the Act and such further or

15

This **WINDING UP PETITION** was filed by Travers Thorp Alberga, attorneys for the Petitioner, whose address for service is 2nd Floor Harbour Place, 103 S. Church Street, 15and Cayman, KY1-1106, Cayman Islands. (Ref: L0702.0006)

FSD2022-0134                            Page 15 of 18                            2022-06-14

alternative relief as this Honourable Court shall think fit.

2. Alexander Lawson and Christopher Kennedy of Alvarez & Marsal be appointed as joint official liquidators of the Company (the "**JOLs**").

3. The JOLs shall not be required to give security for their appointment.

4. The JOLs shall have the power to act jointly and severally in their capacity as liquidators of the Company.

5. The JOLs be authorized to take any such action as may be necessary or desirable to obtain recognition of the appointment of the JOLs in any relevant jurisdiction and to make applications to the courts of such jurisdictions for that purpose.

6. The JOLs be authorized to exercise all the powers set out in Part II of the Third Schedule to the Act within and outside the Cayman Islands without further sanction of the Court.

7. No disposition of the Company's property by or with the authority of the JOLs in carrying out their duties and functions and the excise of their powers under any order granted pursuant to this Petition shall be voided by virtue of section 99 of the Act.

8. The JOLs be at liberty to appoint attorneys, counsel and professional advisors, whether in the Cayman Islands or elsewhere, as they may consider necessary to advise and assist them in the performance of their duties in accordance with Order 25 of the Companies Winding Up Rules (as amended).

9. Subject to section 109(2) of the Act and the Insolvency Practitioner's Regulations 2008 (as amended), the JOLs be authorized to render and pay invoices out of the assets of the Company for their own remuneration and the JOLs be at liberty to meet all disbursements reasonably incurred in connection with the performance of their duties.

10. In the alternative to the appointment of liquidators, the Court exercises its jurisdiction to make orders pursuant to section 95(3)(d) of the Act providing for the purchase of the Petitioners' shares by other shareholders and/or the Company for fair value, to be

16

This **WINDING UP PETITION** was filed by Travers Thorp Alberga, attorneys for the Petitioner, whose address for service is FSD2022-0134, 2nd Floor Harbour Place, 103 S. Church Street, Grand Cayman, KY1-1106, Cayman Islands. (Ref: L0705200 6-14)

FSD2022-0134                    Page 16 of 18                    2022-06-14

       determined by the Court if not agreed and making all necessary adjustments to the composition of the Company's shareholdings to take into account the disproportionate number of shares that were acquired by Mr Steckel and Mr Chen's companies as a result of the Steckel Transaction and all other necessary adjustments to achieve a fair valuation.

11. In the alternative to the appointment of liquidators, the Court exercises its jurisdiction to make orders pursuant to section 95(3)(c) of the Act to authorize proceedings to be brought in the name and on behalf of the Company by the Petitioners to remedy the conduct complained of in this Petition.

12. The Court make such order(s) as may be necessary to give effect to the relief sought above and to prevent any action that would seek to undo the Court's regulation of the conduct of the Company's affairs without further order of the Court.

13. The Petitioners' costs of the Petition be paid by the Company, or such other order as to costs be made as this Honourable Court shall think fit.

14. Such further and other relief as this Honourable Court deems appropriate.

**DATED: 10 JUNE 2022**

_____
**TRAVERS THORP ALBERGA**
**Attorneys for the Petitioners**

NOTE:   It is intended that this Petition be served on the Company, Adrian Steckel, Uphold Holdings LLC, ASP Capital Sub I Inc and Amherst Holdings Limited.

17

This **WINDING UP PETITION** was filed by Travers Thorp Alberga, attorneys for the Petitioner, whose address for service is FSD2022-0134, 2nd Floor Harbour Place, 103 S. Church Street, 17 of 18yman, KY1-1106, Cayman Islands. (Ref: L0705 2006-14

## NOTICE OF HEARING

**TAKE NOTICE THAT** the hearing of this Petition will take place at the Law Courts, George Town, Grand Cayman on                    2022 at                    .

Any correspondence or communication with the Court relating to the hearing of this Petition should be addressed to the Registrar of the Financial Services Division of the Grand Court at PO Box 495, Grand Cayman, KY1-1106, Cayman Islands (Telephone: +1 345 949 4296).

This **WINDING UP PETITION** was filed by Travers Thorp Alberga, attorneys for the Petitioner, whose address for service is 2nd Floor Harbour Place, 103 S. Church Street, Grand Cayman, KY1-1106, Cayman Islands. (Ref: LO/05:2006)

18

FSD2022-0134                           Page 18 of 18                        2022-06-14